UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO.  12-0052 |
| VERSUS | * | JUDGE TOM STAGG |
| JOHN DOE, purporting to be Mark David Hook | * | MAG. JUDGE KAREN L. HAYES |

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a
motion to suppress [doc. # 12] filed by defendant John Doe a/k/a Mark Hook.  For reasons stated
below, it is recommended that the motion be **GRANTED IN PART and DENIED IN PART.**

Background

On April 2, 2008, U. S. Customs and Border Patrol ("CBP") Agent Michael Tyler was
conducting routine transportation checks at the Greyhound Bus Terminal in Baton Rouge,
Louisiana, when he encountered an individual who identified himself as Mark David Hook, a
British national.  Hook/Doe,[1]  however, did not have his passport with him.  Accordingly, Agent
Tyler brought him to the Baton Rouge CBP office where he ascertained that a Mark Hook had
entered the country in June 2004.  At that point, it was apparent that Doe had exceeded (by more
than three years), the 90 day stay period authorized by the Visa Waiver Program.  Therefore,
Tyler took Doe into DHS[2] custody pending his removal and anticipated repatriation to the United

---

[1]  Because of the present uncertainty regarding Hook's actual identity, the court will refer
to him as "John Doe."

[2]  The Department of Homeland Security.

Kingdom.

In order to effect his removal, Doe completed paperwork to replace his missing British passport.  In June 2008, however, the British Consulate in Houston advised Doe that his passport had been reported lost by another person in the United Kingdom, who had provided sufficient evidence of identification to establish that he was the actual Mark Hook to whom the passport had been issued.  Thus, the British Consulate stated that it would require considerably more proof of Doe's identity before it could issue him a travel document.  In July 2008, the Vice-Consul for the British Consulate in Houston traveled to Oakdale, Louisiana, to interview Doe for purposes of establishing his British citizenship.  However, Doe failed to provide the Vice-Consul with sufficient proof.  Thus, on August 15, 2008, the British Consulate deemed Doe's application "withdrawn," because of his failure to provide any paperwork to support his identity or nationality.

By July 2008, because of the suspicious circumstances surrounding his unsuccessful attempt to establish his British citizenship, agents of the U.S. Immigration and Customs Enforcement ("ICE") had come to believe that Doe was hampering his removal and suspected fraud.  They intended to pursue criminal charges against him.

On March 18, 2009, Doe, now represented by counsel, filed a petition for habeas corpus challenging his post-removal detention under the framework established in *Zadvydas v. Davis*, 533 U.S. 678 (2001).  In support of his petition, Doe executed an affidavit as "Mark David Hook," in which he attested that he was a native and citizen of the United Kingdom.  *See Hook v. Holder*, Civil Action No. 09-0423 (W.D. La.).  Furthermore, at a June 17, 2009, evidentiary hearing held in that matter, Doe, having been duly sworn, testified that he was Mark David Hook, a native of the United Kingdom.  Doe confirmed that he truthfully completed the paperwork

provided by the immigration authorities.  He maintained that he was the real "Mark Hook."

Following the hearing, however, this court concluded that Doe was hampering removal and

dismissed his habeas petition.  (June 16 and July 17, 2009, Report & Recommendation and

Judgment [doc. #s 18 & 19 ] in C.A. # 09-0423).

On January 20, 2011, Doe, still purporting to be Mark David Hook, filed a second

petition for habeas corpus that again challenged his post-removal detention under the framework

established in *Zadvydas v. Davis*, 533 U.S. 678 (2001).  *See Hook v. Holder*, Civil Action No.

11-0131 (W.D. La.).  Doe reiterated that he was a native and citizen of the United Kingdom.  On

January 24, 2012, the court set the matter for an evidentiary hearing to be held on March 28,

2012.  *See* Jan. 24, 2012, Order [doc. # 22] in C.A. No. 11-0131.  The evidentiary hearing was

never held, however.

On February 22, 2012,  a federal grand jury returned a one count indictment against John

Doe, purporting to be Mark David Hook, for knowingly hampering his removal from the United

States in violation of 8 U.S.C. § 1253(a)(1)(C).  Doe was arraigned on March 14, 2012, and

entered a plea of not guilty.

On April 25, 2012, Doe filed the instant motion to suppress any and all oral or written

statements that he provided to government agents as a result of the agents' alleged failure to

provide him with requisite *Miranda* warnings before obtaining said statements.  The motion also

seeks to suppress all other evidence against him, presumably consisting of items that were seized

from his luggage without a search warrant.  Following delays for briefing, supplemental briefing,

a June 26, 2012, evidentiary hearing, and transcription of same, the matter is now before the

court.

**Hearing Testimony and Evidence**

Two witnesses testified at the June 26, 2012, evidentiary hearing:  CBP Agent Michael

Tyler and ICE Agent Steven Durio.

     a)     <u>Agent Tyler</u>

Agent Tyler testified that he has 21 years of experience with CBP.  (Hearing Transcript

pg. 6 [doc. # 28]) (hereinafter abbreviated as "Tr.").  On, or about April 2, 2008, Tyler, fellow-

agent Jeraldo Almandadas, and perhaps up to one more agent, were at the Baton Rouge bus

station performing routine transportation checks.  *See* Tr. 8, 23.  In Tyler's experience,

Greyhound buses almost always have aliens onboard, both legal and illegal.  (Tr. 12-13).  Agent

Tyler preferred to check passengers while on the bus, or as they exited the bus.  (Tr. 14-15).

Alternatively, CBP agents would check individuals within the bus terminal.  *See* Tr. 14-15.  Tyler

testified that they tried to spot aliens by their cultural and stylistic differences.  *See* Tr. 15.

Agents from the Baton Rouge Border CBP office would check as many as eight or nine buses per

day, but usually only two to four.  (Tr. 31).

Tyler did not remember his initial encounter with Doe.  (Tr. 15).  However, he recalled

processing him back at the Border Patrol station.  (Tr. 9).  Tyler personally has performed

thousands of bus checks.  (Tr. 10-11).  In fact, the Baton Rouge CBP office apprehended a total

of 17 people on April 2, 2008.  (Tr. 28).  Tyler apprehended eight or nine aliens himself.  (Tr.

27).  The only reason that Tyler recalled Doe at all was because he was the first alien that he

handled under the Visa Waiver Program.  (Tr. 22).[3]

During these document checks at the bus station, Tyler is in uniform.  (Tr. 7).  Tyler

---

[3]  The Visa Waiver Program is available to nationals of about 25 countries.  (Tr. 11).  The
program permits foreign nationals from these countries to enter the United States without a visa
for a period of up to 90 days.  *Id*.

explained that, during an encounter, he initially asks the individual whether he is a U.S. citizen. (Tr. 7-8).  If the individual responds that he is a U.S. citizen, and his behavior was not otherwise problematic, then he is free to go on his way.  *Id.*; Tr. 29-30.  Furthermore, if the individual states that he does not wish to speak to the agent, then he would be permitted to leave.  *Id.*  If, on the other hand, the traveler acknowledged that he was a citizen of another country, then Tyler would ask for the individual's travel documents, because, by law, foreign nationals are required to have the documents in their possession.  *See* Tr. 7-8.  If the individual did not have his papers on him, then Tyler would try to verify the whereabouts and existence of the requisite documents.  (Tr. 8). If Tyler was unable to verify an alien's status at the bus station, then he would take the individual to the CBP office to run fingerprints and record checks.  (Tr. 8).

Tyler testified that although he did not recall his initial encounter with Doe, it was manifest that Doe did not have his immigration documents, otherwise, Tyler would not have taken Doe to the CBP office.  (Tr. 19).  Moreover, Doe voluntarily accompanied Tyler to his office.  (Tr. 29).

Agent Tyler documented his encounter with Doe/Hook on a Record of Deportable/Inadmissible Alien, I-213 Form.  (Def. Exhs. 1-2 [doc. # 25]).  The I-213 Form contains basic booking information concerning an alien, and documents Tyler's interaction with Doe.  (Tr. 20-21).  According to the form, Doe told Tyler that he was a British citizen and visitor to the United States under the Visa Waiver Program.  (Def. Exh. 1; Tr. 16).  Doe claimed to have entered the United States approximately two weeks earlier.  *Id.*  Doe did not have his passport in his possession; rather, he claimed to have left it in New York.  *Id.*

Tyler was unable to confirm Doe's information from his fingerprints.  (Tr. 11).  However, record checks for "Hook" indicated that he last entered the United States in 2004, via San Juan,

5

Puerto Rico  *Id*.; Def. Exh. 1.  When questioned about this inconsistency, Doe conceded that he

had entered the United States in March or June 2004.  *Id*.

      Throughout his interaction with Doe, Tyler did not advise him of his *Miranda* rights

because Doe's case was purely administrative, not criminal.  (Tr. 23, 34).  Tyler had no reason to

suspect that Doe was not who he said he was.  (Tr. 33).  Tyler discerned nothing from his report

to indicate that this was a criminal matter.  (Tr. 34).

      When Tyler finished his report, he advised Doe that he was going to be deported back to

England.  (Tr. 28).  In the interim, CBP agents transported Doe to jail in New Orleans.  *Id*.

      b)    <u>Agent Durio</u>

      Steven Durio is a deportation officer with the Department of Homeland Security,

Immigration Customs Enforcement ("ICE"), stationed at Oakdale, Louisiana.  (Tr. 35-36).  He

has been a deportation officer since September 23, 2002, and a detention enforcement officer and

immigration agent from 1998 until 2002.  *Id*.  Durio's job includes trying to obtain travel

documents to remove aliens to their home countries.  (Tr. 36).

      Durio stated that when an alien comes into ICE's custody, they begin to serve him with

Warning for Failure to Depart, I-229(a) notices and instruction sheets that request biographical

information.  (Tr. 39).  Durio testified that ICE does not *Mirandize* the alien when it serves the

instruction sheets.  (Tr. 40-41).  Furthermore, Durio did not *Mirandize* Doe when he handed him

the I-229(a) notices.  *See* Tr. 42.

      Durio testified that other deportation officers who filled out similar forms for Doe were

acting in their administrative capacities.  (Tr. 47).  Durio became a prosecution officer in this

case some time in January-February, 2011.  (Tr. 49).  After he became a prosecution officer,

Durio continued to serve I-229(a) forms on Doe.  (Tr. 49-50).  However, Durio never advised

Doe of his *Miranda* rights.  *Id.*  Doe continued to provide ICE with the same information that he

had been providing since he entered into ICE custody.  *Id.*

Durio stated that ICE sought a criminal prosecution against Doe because it was

determined that the passport that Doe, a black male, used to enter the country was, in fact, issued

to a white male, Mark David Hook.  (Tr. 52-53).

### Other Evidence

In response to a query from the court,[4] both sides agreed that the court may take judicial

notice of the testimony and written evidence adduced in *Hook v. Holder*, Civil Action Number

09-0423 (W.D. La.), at least for the limited purpose of the instant motion to suppress.  *See* Def.

Resp. Memo., [doc. # 41]; Gov't Resp. [doc. # 42]; Fed.R.Evid. 201; and *United States v.*

*Montemayor*, 666 F.2d 235, 237 (5th Cir. 1982) (district court may take judicial notice of matters

pending on its own docket).

On April 12, 2008, Doe completed an application for a U.K. passport.  *See Hook v.*

*Holder*, Civil Action No. 09-0423 (W.D. La.)  (Gov't Ans. Exhs. 5-7 [doc. # 8-2]).  On April 18,

2008, ICE forwarded the request for travel documents to the U.K. Consulate in Houston.  *Id.*,

Exh. 8.

On June 16, 2008, ICE Agent Jeannine Fruge' attempted to obtain a sworn statement

from Doe regarding his identity, citizenship, and passport.  (C.A. No. 09-0423, Gov't Ans., Exh.

14 [doc. # 8-2]).  However, Doe testified at a June 17, 2009, evidentiary hearing that Agent

Fruge' read him his "rights," and threatened him with a five to ten year jail term if he made a

mistake.  (C.A. No. 09-0423, Transcript of June 17, 2009, Evid. Hearing, pgs. 21-22 [doc. # 25]).

Consequently, Doe invoked his right to counsel and declined to provide a sworn statement to

---

[4] *See* Aug. 22, 2012, Order [doc. # 33].

Agent Fruge'.  *Id*.

On June 17, 2008, Vice-Consul Linda Kelly of the British Consulate in Houston wrote a letter to Doe advising him that she was going to require further proof of his identity before the consulate could issue him a passport.  (C.A. No. 09-0423, Gov.'t Ans. Exh. 17 [doc. # 8-2]).

On June 20, 2008, Vice-Consul Linda Kelly again wrote to Doe informing him that the passport he claimed to have lost, "had already been reported lost by an individual in the U.K. The person in the UK was able to provide sufficient evidence of identification that matched previously issued passports and so the passport was replaced."  *Id*., Gov.'t Exh. 19.

By July 2, 2008, ICE had referred Doe's case to an Assistant U.S. Attorney for the Western District of Louisiana for possible prosecution.  *Id*., Gov.'t Exh. 21, pg. 7.

On July 7, 2008, Agent Fruge' wrote a letter to Interpol requesting further information as to Doe because ICE was pursuing a criminal prosecution against him for fraud.  *Id*., Gov.t Exh. 22.

On August 15, 2008, Vice-Consul Linda Kelly wrote a letter to ICE Agent Fruge' wherein Kelly advised Fruge' that because Doe had not provided the consulate with any paperwork to support his identity or nationality, the consulate was withdrawing his application. *Id*., Gov.'t Exh. 27.

The government seeks to introduce approximately 23 written or oral statements provided by Doe that span the period from his initial encounter with Agent Tyler on April 2, 2008, through February 16, 2012.  (Gov.'t Resp., Time Line [doc. # 42]).[5]

---

[5]  Although the Time Line includes an entry for April 21, *2012*, the cited exhibit indicates that the statement was taken on April 21, 2011.  See Gov.'t Exh. 12.

**Analysis and Discussion**

## I.      Fourth Amendment

Defendant contends that his initial questioning by Agent Tyler transgressed the

protections of the Fourth Amendment, i.e., "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend.

IV.  However, the Supreme Court has held that

> law enforcement officers do not violate the Fourth Amendment by merely
> approaching an individual on the street or in another public place, by asking him if
> he is willing to answer some questions, by putting questions to him if the person
> is willing to listen, or by offering in evidence in a criminal prosecution his
> voluntary answers to such questions.  Nor would the fact that the officer identifies
> himself as a police officer, without more, convert the encounter into a seizure
> requiring some level of objective justification. The person  approached, however,
> need not answer any question put to him; indeed, he may decline to listen to the
> questions at all and may go on his way.

*Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 1324 (1983) (internal citations
omitted).

Furthermore,

> [e]ven when law enforcement officers have no basis for suspecting a particular
> individual, they may pose questions, ask for identification, and request consent to
> search luggage—provided they do not induce cooperation by coercive means.  If a
> reasonable person would feel free to terminate the encounter, then he or she has
> not been seized."

*United States v. Drayton*, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110 (2002) (internal citations
omitted).

Defendant contends, in brief, that he was not aware that he had the option to decline to

respond to Agent Tyler's questions.  The relevant inquiry, however, is not the defendant's

subjective belief; rather, it is whether a reasonable person would feel free to terminate the

encounter.  *See Drayton, supra*; *United States v. Harrell*, 894 F.2d 120, 124 (5th Cir. 1990)

(defendant's subjective sensations during immigration detention are irrelevant, because the focus

is upon what a "reasonable person" would understand under the circumstances).  In so deciding,

the court must consider the totality of the circumstances; no individual factor is necessarily determinative.  *United States v. Chavez*, 281 F.3d 479, 484 (5th Cir. 2002) (citation omitted).

In this case, Agent Tyler does not recall his initial encounter with Doe because he has been involved in thousands of such encounters.[6]  However, Tyler testified that it was his practice to ask bus travelers whether they were U.S. citizens.  (Tr. 7-8).  If they did not feel like talking, they were free to leave.  *Id*.  There is no evidence in this case that Tyler's tone or demeanor were coercive or that he otherwise restricted Doe's freedom of action or movement.  Likewise, there is no indication that Tyler brandished his weapon or advised Doe that he was required to interact with him.  Accordingly, upon consideration of the totality of the circumstances, the court concludes that the initial interaction between Tyler and Doe was a consensual encounter -- not a detention that implicated the Fourth Amendment.  *See Chavez, supra*.

Furthermore, once Doe admitted to Agent Tyler that he was not a U.S. citizen and that he was without a passport or official documents authorizing his presence in the country, these facts provided Agent Tyler with probable cause to arrest, or at least, further detain Doe.  *Martinez v. Nygaard*, 831 F.2d 822, 828 (9th Cir. 1987) (citation omitted); *State v. Nebar*, 529 So. 2d 117, 121 (La. App. 4th Cir. 1988); 8 U.S.C.A. § 1357 (authority to arrest alien if officer has reason to believe that the alien is in the country in violation of any a law or regulation);  *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536 (2001) ("an officer [who] has probable cause to believe that an individual has committed even a very minor criminal offense in his presence . . . may, without violating the Fourth Amendment, arrest the offender").

Doe then accompanied Agent Tyler to the Baton Rouge CBP Office where a database

---

[6]  Sheer numbers preclude immigration agents from recalling the precise circumstances of each encounter.  *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1049, 104 S. Ct. 3479 (1984).

search of the name and information provided by Doe (i.e. Mark Hook) confirmed that he had

significantly overstayed the 90 days permitted under the Visa Waiver Program applicable to

British citizens.  Accordingly, Tyler detained Doe, pending his anticipated repatriation to his

native country, the United Kingdom.

These facts do not suffice to establish a Fourth Amendment violation.[7]

## II.    Fifth Amendment and Miranda

In addition to his Fourth Amendment challenge, defendant contends that government

agents violated his Fifth Amendment right against self-incrimination because he was not advised

of his *Miranda* rights, and therefore, did not voluntarily, knowingly, and intelligently waive

same.

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal

case to be a witness against himself . . ."  U.S. CONST. AMEND. V.  In *Miranda v. Arizona*, the

Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory,
> stemming from custodial interrogation of [a] defendant unless it demonstrates the
> use of procedural safeguards effective to secure the privilege against
> self-incrimination. By custodial interrogation, we mean questioning initiated by
> law enforcement officers after a person has been taken into custody or otherwise
> deprived of his freedom of action in any significant way. As for the procedural
> safeguards to be employed, unless other fully effective means are devised to
> inform accused persons of their right of silence and to assure a continuous
> opportunity to exercise it, the following measures are required. Prior to any
> questioning, the person must be warned that he has a right to remain silent, that
> any statement he does make may be used as evidence against him, and that he has
> a right to the presence of an attorney, either retained or appointed.

---

[7]  Although defendant argued in his original motion that his luggage was seized and
searched without probable cause or a search warrant.  There is no indication that the government
uncovered anything incriminating in his luggage that it intends to use against Doe at trial.
Moreover, Doe failed to address this component of his motion in his post-hearing briefs.  Thus,
insofar as defendant seeks to suppress any items found in his luggage, the court finds that the
issue is moot and/or abandoned.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) (footnote omitted).

The central principle established by *Miranda* is that if the police question an in-custody suspect without informing him of the rights specified therein, then his responses cannot be introduced into evidence to establish his guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144 (1984). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting waiver has generally produced a virtual ticket of admissibility . . ." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 2608 (2004) (footnote omitted).

However, "[t]he ... *Miranda* warnings are not themselves rights protected by the Constitution but [are] instead measures to insure that the [suspect's] right against compulsory self-incrimination [is] protected." *Moran v. Burbine*, 475 U.S. 412, 424-25, 106 S. Ct. 1135, 1142-43 (1986) (citations and internal quotation marks omitted). Indeed, the *Miranda* exclusionary rule is broader than the Fifth Amendment itself, and may be triggered even in the absence of a Fifth Amendment violation. *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S. Ct. 1285, 1291-92 (1985). Because *Miranda*'s prophylactic warnings are not constitutional rights in and of themselves, a *Miranda* violation does not compel the suppression of all other statements under the "fruit of the poisonous tree" doctrine. *Harrell*, 894 F.2d at 125 (citing *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 1290 (1985)).

An individual is deemed "in custody" for purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Stevens*, 487 F.3d 232, 241 (5th Cir. 2007) (citing *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.1988) (en banc)). The Supreme Court has held

that car occupants who are temporarily detained pursuant to a non-coercive traffic stop are not considered "in custody" for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150 (1984). Also, immigration detentions typically are not the equivalent of formal arrests. *Harrell, supra* (citation omitted). In fact, the Fifth Circuit found no "custodial questioning" where the defendant made incriminating statements moments into investigatorial questioning by immigration agents in a windowed room at an airport, even where the questioning continued thereafter for up to an hour. *Id.*; s*ee also United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010) (routine immigration questioning at a fixed checkpoint does not render a person in custody).

The foregoing authority suffices to establish that the non-coercive, consensual encounter between Doe and Tyler at the bus terminal did not constitute "custodial questioning" as required to mandate *Miranda* warnings. Furthermore, to the extent that Doe was "in custody" when he accompanied Agent Tyler to the CBP office, ordinary biographical questions that are part of the routine booking process typically do not constitute an interrogation under *Miranda*. *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir. 1989), *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 2650 (1990) (recognizing "routine booking question" exception to *Miranda*'s coverage). Furthermore, "*Miranda* warnings are not required in the deportation context, for deportation proceedings are civil, not criminal in nature . . ." *Bustos-Torres v. I.N.S.*, 898 F.2d 1053, 1056 (5th Cir. 1990) (citations omitted).[8]

---

[8] The Fifth Circuit has held that
a Miranda warning need not be given by immigration officials . . .  unless and until the questioning of the officials becomes an interrogation that is custodial in nature in which information is sought for the purpose of using it against such person in a criminal proceeding.
*United States v. Henry*, 604 F.2d 908, 915 (5th Cir. 1979) (citations omitted).

Here, there is no indication that Agent Tyler sought any more information than necessary to establish Doe's identity and immigration status.  Moreover, Tyler had no cause to suspect Doe of being anyone else other than who he purported to be.  As far as Tyler was concerned, the case was purely administrative, and Doe would be promptly removed back to his professed homeland, the United Kingdom.  Indeed, it was not until after Doe unsuccessfully applied for a U.K. passport that ICE began to question the veracity of Doe's representations.

Nonetheless, even once ICE began to suspect that Doe was hampering his removal, the court observes that the Fifth Amendment's prohibition against self-incrimination relates solely to crimes alleged to have been committed *prior to the time when the testimony is sought*.  *United States v. Kirk*, 528 F.2d 1057, 1061-62 (5th Cir. 1976) (citation(s) omitted).  "[A]s a general rule it can be said that no fifth amendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged." *Id*.; *United States v. Owuor*, 397 F. App'x 572, 575 (11th Cir. 2010) *cert. denied,* ____ U.S. ____, 131 S. Ct. 1522 (2011) (because defendant's statements to ICE agents constituted new crimes, rather than statements that related to past crimes, there was no fifth amendment problem).  Stated somewhat differently, "[t]he exclusionary rule does not act as a bar to the prosecution of a crime where the statements themselves are the crime."  *United States v. Melancon*, 662 F.3d 708, 712 (5th Cir. 2011) *cert. denied,* ____ U.S. ____, 132 S. Ct. 2119 (2012); *see also United States v. Smith*, 7 F.3d 1164, 1167 (5th Cir. 1993).

Applying the foregoing authority to the facts at hand, the court finds that suppression of the un-*Mirandized* statements that ICE agents obtained from Doe, which presumably consist of his tireless refrain that he is Mark Hook from the U.K., is not warranted, as the statements either constitute separate instances of crimes, or otherwise form part of his ongoing scheme to prevent

or hamper his removal.[9]

Nevertheless, on the apparently lone occasion on June 18, 2008, that an ICE agent *did* advise Doe of his "rights," he promptly invoked his right to counsel, and declined to answer the questions.[10]  At that point, Doe was not subject to further interrogation by the authorities until counsel had been made available to him, unless he initiated further communication, exchanges, or conversations with the police.  *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85 (1981).  Moreover, there is no evidence that Doe took further action to waive his invocation of counsel until March 18, 2009, when he filed his first habeas petition, and re-confirmed that he was Mark (or Marc) Hook, a native of the United Kingdom.  *See* C.A. # 09-0423, Petition and Affidavit.[11]  Accordingly, the four statements that ICE obtained in the

---

[9]  As the government recognized in its brief, it may be necessary to expand the indictment to include these additional statements or otherwise file a motion under Federal Rule of Evidence 404(b).

[10]  A prison inmate is not automatically deemed to be "in custody" simply by virtue of his incarceration.  *United States v. Melancon*, 662 F.3d 708, 711 (5th Cir. 2011) (citing *United States v. Smith*, 7 F.3d 1164, 1167 (5th Cir. 1993).  Here, however, the government has not established the circumstances and conditions under which Doe provided each of his post-detention statements such as to permit the court to make a determination that he was not "in custody," – irrespective of the prison setting.  Thus, for purposes of any statements made after April 2, 2008, the court will presume that Doe was "in custody."

[11]  In *Maryland v. Shatzer*, the Supreme Court held that when a questioned suspect invokes his right to counsel, authorities may re-question him following the passage of a 14 day break-in-custody period.  *Maryland v. Shatzer*, ___ U.S. ___ , 130 S. Ct. 1213, 1222 (2010).  The Court further held that the release of a convicted suspect back into the general prison population constitutes a break-in-custody, such that authorities may re-question him after 14 days, despite his initial request for counsel.  *Id*.  The government contends in this case, that pursuant to *Shatzer*, ICE agents were permitted to re-question Doe after fourteen days had elapsed.  However, the *Shatzer* decision is premised, at least in part, upon the Court's recognition that "lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*."  *Shatzer*, 130 S. Ct. at 1224.  Furthermore, the detention of *sentenced* prisoners is "relatively disconnected from their prior unwillingness to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration,

intervening period between June 16, 2008, and March 18, 2009, must be suppressed for purposes of the government's case-in-chief.  *See Edwards, supra*.[12]

### Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 12] filed by defendant John Doe be **GRANTED IN PART**, solely to the extent that the government seeks to introduce, in its case-in-chief, defendant's statements obtained between June 16, 2008, and March 18, 2009.

**IT IS FURTHER RECOMMENDED** that the motion to suppress [doc. # 12] otherwise be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within

---

which was determined at sentencing." *Id*., at 1224-5.

Here, in contrast, and at least as far as the court is aware, agents of the same agency (ICE) that was responsible for Doe's detention, also were questioning him.  Doe's interrogator(s) had the power to continue his detention – a power that they continued to exercise.  Thus, by no means could it be said that Doe's continued detention was divorced from his prior unwillingness to respond to questioning.  Consequently, the court is not persuaded that the government can avail itself of the fourteen day break-in-custody exception recognized in *Shatzer*.

[12]  It could be argued, with some persuasiveness, that pursuant to the inevitable discovery rule or the independent source doctrine, the court should permit the introduction of the tainted statements in light of the many occasions that Doe consistently and uniformly presented himself as Mark Hook, a native of the United Kingdom.  Conversely, the same rationale, i.e., the fact that the suppressed statements are entirely cumulative and redundant, undermines the need to apply one of the foregoing exceptions here.  Furthermore, by suppressing these few statements, the court discerns no grounds that would mandate the suppression of the many other instances where Doe maintained his British persona.  *See United States  v. Brathwaite*, 458 F.3d 376, 382 n7 (5th Cir. 2006) (district court properly declined to suppress physical evidence, despite officer questioning defendant prior to giving him *Miranda* warnings); *United States v. Mendez*, 27 F.3d 126, 130 (5th Cir. 1994) ("A mere violation of Miranda's 'prophylactic' procedures does not trigger the fruit of the poisonous tree doctrine.").

**fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 1st day of October 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE